**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

RICHARD HODGSON, #276827,

        Petitioner,

v.                                    Case No. 2:06-CV-11311
                                       Honorable Nancy G. Edmunds
                                       Magistrate Judge Donald A. Scheer

MILLICENT WARREN,

        Respondent.

_____/

**OPINION AND ORDER CONDITIONALLY GRANTING**
**PETITION  FOR WRIT OF HABEAS CORPUS**

        Petitioner, Richard Hodgson, is a state inmate currently incarcerated at Newberry Correctional Facility in Newberry, Michigan, where Barry D. Davis is the warden.  At the time Petitioner initially filed his request for habeas relief, he was incarcerated at Thumb Correctional Facility in Lapeer, Michigan where Millicent Warren _was_ the warden. Petitioner was convicted in Wayne County Circuit Court of two counts of assault with intent to commit murder, Mich. Comp. Laws §750.83, and possession of a firearm during the commission of a felony, Mich. Comp. Laws §750.227b.  Petitioner was sentenced to concurrent prison terms of sixteen to forty years' imprisonment for the assault convictions and a consecutive two-year prison term for the felony firearm conviction. He filed a petition for a writ of habeas corpus through counsel under 28 U.S.C. §2254.  For the reasons stated below, the Court will grant the petition.

# I. BACKGROUND

The convictions arose from the shootings of Maria Hernandez and Scott

Anderson.  The state appellate court in this case set forth underlying facts, which are

presumed correct on habeas review, see *Monroe v. Smith,* 197 F. Supp.2d 753, 758

(E.D. Mich. 2001), *aff'd.*

41 Fed. Appx. 730 (6th Cir. 2002), as follows:

> According to Maria Hernandez, she knew Hodgson because he had dated
> her aunt and because her brother, Lorenzo Hernandez, had been in an
> altercation with Hodgson.  Maria Hernandez stated that, on the evening in
> question in April 1998, she was standing with her brother when Hodgson
> and a group of individuals approached them.  Lorenzo Hernandez walked
> away, and Hodgson approached her.  Hodgson asked about her brother's
> whereabouts and, when she refused to answer, they argued.  Maria
> Hernandez said that, as they were arguing, she heard someone yell,
> "[s]hoot this bitch."  Hodgson then reached into his waistband and pulled
> out a gun, which prompted her to begin running.  She heard shots, and
> then she realized that a bullet had hit her in the leg. Maria Hernandez
> blacked out momentarily and, when she regained consciousness, saw
> Hodgson jumping up and down while saying, "I'm a crazy motherfr."
>
> Scott Anderson's account of the incident was highly similar. He stated that
> he was with his brother, Thomas Anderson, and Maria Hernandez when
> Hodgson approached them with three or four other individuals and began
> arguing with Maria Hernandez.  Anderson heard Hodgson say, "I'm the
> baddest motherf----r on the face of the earth" and that he would shoot
> Maria Hernandez.  Immediately before Hodgson pulled a gun from his
> pants, Scott Anderson said, Hodgson stated, "[s]hoot this bitch."  At that
> point, Scott Anderson turned to run, but bullets hit his leg, his temple, and
> both of his arms.
>
> Thomas Anderson confirmed that he was with Maria Hernandez and his
> brother, Scott Anderson, when Hodgson and his friends approached.
> Thomas Anderson heard Hodgson tell Maria Hernandez that he was
> looking for her brother and heard Maria Hernandez refuse to tell him her
> brother's whereabouts. He then saw Hodgson pull out a gun, at which time
> he grabbed his brother.  They ran until Scott Anderson was shot.
>
> Sometime later, Ubaldo Mendoza was in a Friend of the Court office when
> he overheard Hodgson bragging to someone else that he had just been

2

released from the Fourth Precinct, where he had been brought in because of a child support issue and a murder charge, evidently related to the two shootings. Mendoza recounted that Hodgson (who was unaware that Maria Hernandez was Mendoza's daughter) said that he had been looking for Lorenzo Hernandez. Hodgson said that when he saw Maria Hernandez, she refused to reveal where Lorenzo Hernandez was, which made Hodgson angry. Then, Hodgson indicated, someone told him to shoot Maria Hernandez. Mendoza said that Hodgson

"got a 9mm and say he just went to scare her, you know, shot at he leg and you know, he didn't want to kill her, he just shot at the leg and you know, she fell down and somebody else came out and he said you want some too, and he shot at him, too, you know."

According to Mendoza, Hodgson said that he planned to tell the police that he did not know who was doing the shooting and that the real assailant shot at him as well.

At trial, the testimony concerning who shot Maria Hernandez and Scott Anderson was somewhat varied. In addition to Maria Hernandez' testimony, two police officers stated that she had identified Hodgson as the shooter. On direct examination, Scott Anderson retold his version of the shooting and said that he saw Hodgson with a gun. Defense counsel then impeached Scott Anderson with a portion of his preliminary examination testimony in which he said that he did not actually see Hodgson with a gun, prompting the prosecutor to rehabilitate Scott Anderson's testimony with his other statements at the preliminary examination. Other witnesses to the shooting generally corroborated what Maria Hernandez and Scott Anderson said occurred, but two witnesses indicated that Hodgson did not have a gun and one witness testified that he saw a man, apparently not Hodgson, step out from between two houses and shoot.

*People v. Hodgson,* 2002 WL 226892, *1, *2 (Mich. Ct. App. Feb. 12, 2002).

Petitioner filed an appeal of right and raised the following claims:

I. Defendant is entitled to a new trial on the basis of newly discovered evidence and/or ineffective assistance of counsel, where the testimonial evidence from *Ginther* hearing revealed that at least four (4) witnesses would have testified that the shooting was the result of the actions of a person other than the defendant, that trial defense counsel never interviewed or attempted to produce any of them as a witness at trial, and counsel failed to request an appropriate remedy pursuant to CJI 2d 5.12 when an endorsed witness could not be produced by the prosecutor.

3

II.  The trial court committed reversible error by admitting irrelevant bad act evidence contrary to MRE 404(b) where the prosecutor failed to show that its probative value to a material issue outweighed its inherently prejudicial character, thereby denying the defendant due process under the U.S. Const. AMS V, XIV; Mich Const. 1963, Art. I, §7.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *Id.* Petitioner filed a

delayed application for leave to appeal with the Michigan Supreme Court and raised the

following issues:

I.  Defendant is entitled to a new trial based on ineffective assistance of counsel, where the testimonial evidence from the four day *Ginther* hearing revealed that at least four (4) witnesses would have testified that the shooting was the result of the actions of a person other than the defendant, that trial defense counsel never interviewed or attempted to produce any of them as a witness at trial, and counsel failed to request an appropriate remedy pursuant to CJI2d 5.12 when a prosecution witness requested by the defense was not produced by the prosecutor, and the prosecution offered no explanation for the non-production of the witness.

II.  The Court of Appeals erred in refusing to grant a new trial on the basis of newly discovered evidence, where the defendant presented testimony through various witnesses that the actual perpetrator of the crime admitted that he, rather than the defendant, committed the crimes in this case, thereby exonerating the defendant from any wrongdoing, and the testimony further established that the defendant could not, with reasonable diligence, have produced this evidence at his trial.

III.  The trial court committed reversible error by admitting irrelevant bad act evidence contrary to MRE 404(b) where the prosecutor failed to show that its probative value to a material issue outweighed its inherently prejudicial character, thereby denying the defendant due process under the U.S. Const. AMS V, XIV; Mich Const. 1963, Art. I, §7.

The Michigan Supreme Court denied Petitioner's delayed application for leave to

appeal.

*People v. Hodgson,* 467 Mich. 909; 655 N.W..2d 556 (2002) (table).    Petitioner then

filed a motion for reconsideration with the Michigan Supreme Court which was denied.

4

*People v. Hodgson,* 467 Mich. 909; 658 N.W.2d 487 (table). Petitioner subsequently

filed a  motion for relief from judgment and raised the following issues: (1) entitlement to

a "new trial because Officer Melendez, the officer in charge of collecting evidence and

interviewing witnesses at the scene was indicted in federal court on charges of lying and

planting  evidence in criminal drug cases;" (2) " there is newly discovered evidence that

prosecution witnesses, Alicia Hernandez and Scott Anderson perjured themselves at

trial;" and (3) "defendant was denied his constitutional right to effective assistance of

appellate counsel." Pet. Ex. D, 10/6/04, pp. 2, 3, 5. Petitioner's motion was denied. *Id.*

Petitioner filed a delayed application for leave to appeal with The Michigan Court

of Appeals which was denied.  *People v. Hodgson,* No: 259913 (Mich. Ct. App. June 24,

2005).  Petitioner then filed a delayed application for leave to appeal with the Michigan

Supreme Court which was also denied. *People v. Hodgson,* 474 Mich. 940; 706 N.W.2d

20 (table).  A motion for reconsideration was filed by the Petitioner with the Michigan

Supreme Court, and that was also denied.  *People v. Hodgson,* 474 Mich. 1067; 711

N.W.2d 26 (2006).

Petitioner now seeks a writ of habeas corpus asserting the  following claims:

I.  Petitioner was denied a fair trial where testimonial evidence from a
post-conviction hearing revealed that four (4) witnesses would have
testified that the shooting was the result of the actions of a person other
than the petitioner and defense counsel never interviewed or attempted to
produce any of the witnesses for trial; and where a sworn affidavit of
potential witness Theresa Rose-Demni revealed that she witnessed the
shooting, and would have testified that the shooting was the result of the
actions of someone other than the defendant, and that trial counsel never
attempted to produce her as a witness at trial, despite the fact that she
personally informed defense counsel of the information she possessed
prior to trial, thereby denying petitioner effective representation and due
process of law pursuant to U.S. Const. Ams. V, VI, XIV.

5

II.  Petitioner was denied a fair trial when the trial court admitted irrelevant bad act evidence, where the prosecutor failed to show that its probative value to a material issue outweighed its inherently prejudicial character, thereby denying petitioner due process under the U.S. Const. Ams. V, XIV.

III.  The trial court denied Petitioner due process under the U.S. Const. Ams. V, XIV, when it summarily denied his post-conviction motion for a new trial without even conducting a hearing when the petitioner presented sworn affidavits from several newly discovered witnesses, who (1) would have testified favorable for the Petitioner at retrial, and (2) would have established that the trial testimony of the main prosecution witnesses implicating the defendant as the shooter was a fabrication.

Respondent has filed an answer to the petition, asserting that Petitioner's claims do not involve an objectively unreasonable application of clearly established Supreme Court law.  In response, Petitioner  filed a reply brief.

## II.  STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this court's habeas corpus review of state court decisions.  Petitioner is entitled to the writ of habeas corpus if he can show that the state court's adjudication of his claim on the merits:

 (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court

6

has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different fro an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law objectively unreasonable." *Id.* at 409. "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker,* 371 F.2d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. §2254(e)(1)).

## III.  DISCUSSION

### A. Ineffective Assistance of Counsel

#### 1.  Failure to Produce Witnesses

Petitioner claims that trial counsel, Mr. Mitchell, was ineffective for failing to call any witnesses on his behalf, and in particular for failing to call Edwardo Hinton, Michael Hinton, Joseph Probe, Henry Fields, Virginia Smith, and Theresa Rose-Demni. They would have attested to the fact that Petitioner did not shoot Maria Hernandez and Scott Anderson. Vicki Close is another witness Petitioner asserts would have testified that she reviewed letters purportedly from Robert Wyatt, who is now deceased, where he admits to committing the shootings. The Michigan Court of Appeals rejected

7

Petitioner's claim:

> We agree with the trial court that the record is devoid of any evidence that
> [Kerri] Mitchell was made aware of or could have discovered the
> witnesses who would have allegedly identified [Robert] Wyatt as the
> shooter. At the *Ginther* hearing, Mitchell said that he discussed strategy
> and which witnesses to call with Hodgson. Though Mitchell could not give
> much detail concerning these discussions because of the time that had
> passed since they occurred [approximately three years], during which he
> had also transferred Hodgson's case to another attorney, the record does
> not indicate that these potential witnesses' names came to light. Though
> their motivations were varied, the Hintons, Fields, and Probe each had
> reasons for not revealing that they had arguably relevant information
> regarding the crime before trial when Wyatt may have still been alive.
> This makes us question how even diligent inquiry would have allowed
> Mitchell to find them. Further, [Vicki] Close did not discover the letters
> until after trial in this case, and [Virginia] Smith had been subpoenaed, but
> failed to appear.
>
> Even setting aside all the reasons that Smith, the Hintons, Probe, and
> Field[s], made poor witnesses-including their relationships with Hodgson,
> each man's criminal history, and two witnesses' intoxication at the time of
> the shooting-Mitchell clearly chose to pursue a specific strategy at trial.
> While these witnesses' testimony may have bolstered the defense theory
> that the physical evidence was incompatible with the prosecution
> testimony, thereby eliminating Hodgson as the shooter, the defense still
> existed without their participation in the trial. Further, that Mitchell's
> strategy failed is not reason enough to conclude that he was ineffective.

*Hodgson,* 2002 WL 226892 at *4.

To show that Petitioner was denied the effective assistance of counsel under

federal constitutional standards, a defendant must satisfy a two-prong test. In

*Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court sets

forth the two-pronged test for determining whether a habeas petitioner has received

ineffective assistance of counsel. First, a petitioner must prove that counsel's

performance was deficient. This requires a showing that counsel made errors so

serious that he or she was not functioning as counsel as guaranteed by the Sixth

8

Amendment. *Strickland,* 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced the

defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland,* a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" *Id.* at 694. Relative to a "reasonable probability," the question is whether the evidence which was not revealed, "taken as a whole, might well have influenced the jury's appraisal of [Petitioner's] culpability" and whether "the likelihood of a different result if the evidence had gone in is sufficient to undermine the confidence in the outcome actually reached . . . " *Rompilla v. Beard*, 545 U.S. 374, 376 (2005).

"On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy,* 99 F.3d 1302, 1311-12 (6th Cir. 1996).

9

### a.  Duty to Investigate

Petitioner argues that Mr. Mitchell was ineffective because he failed to conduct a proper investigation relative to the above referenced witnesses.  Petitioner contends that the witnesses would have provided crucial evidence which would have exonerated him of the assault and firearm charges.

*Strickland* requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington,* 466 U.S. at 691.  "[T]he duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up . . . " *Rompilla v. Beard,* 545 U.S. 374, 383 (2005).  "American Bar Association standards, which provide guidance as to what constitutes 'reasonable' professional conduct also mandate counsel's duty to investigate all leads relevant to the merits of the case." *Blackburn v. Foltz,* 828 F.2d 1177, 1183 (6th Cir. 1987) (citing ABA Standards for Criminal Justice 4-4.1, 4-54-4.55 (1980)) (internal citations omitted). "Attorneys do however, have a duty to make all reasonable efforts to learn what they can about a case."  *Rompilla,* 545 U.S. at  385. "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir. 2005).     "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his [or her] options and make a reasonable choice between them.'" *Id.*  quoting *Horton v. Zant,* 941 F.2d 1449, 1462 (11 Cir. 1991). Stated differently, "[i]t is not reasonable to refuse to investigate when their investigator does not know the relevant facts the investigation will uncover." *Dickerson v. Bagley,* 453 F.3d 690, 696 (6th Cir. 2006).  Inattention or negligence, as opposed to reasoned

10

strategic judgment, is inexcusable.  *Wiggins v. Smith*, 539 U.S. 510, 526 (2003); *Sims v. Livesay,* 970 F.2d 1575, 1580-81 (6th Cir. 1992).

To demonstrate deficient performance or prejudice resulting from a failure to investigate, a petitioner must "make some showing of what evidence counsel should have pursued and how such evidence would have been material."  *Hutchinson v. Bell,* 303 F.3d 720, 748 (6th Cir. 2002). "[T]here is no need to show that the evidence that might have been discovered would have been helpful -  only that a proper judgment could not be made without the investigation when failure to investigate is thought to be sufficiently serious."  *Poindexter v. Mitchell,* 454 F.3d 564, 588 (6th Cir. 2006) (Boggs, C.J., concurring).

### i.  Potential Witnesses

Petitioner alleges that Mr. Mitchell counsel was conclusively aware of two exculpatory witnesses at the time of trial.  First, Virginia Smith was subpoenaed by the prosecution as a witness.  Therefore, Mr. Mitchell knew about Ms. Smith.  Although she was present on the first day of trial, she failed to appear on the second and final day of trial because she had been drinking the night before and did not wake up in time to come to court.  Evid. Hr'g., 1/26/01, pg. 23.  Ms. Smith testified at the *Ginther* hearing that although she did not see who shot Hernandez and Anderson, she knew that Petitioner did not commit the shooting because he did not have a gun, and the shots came from the opposite direction from where she and Petitioner were standing.  *Id.* at 11-17.  Ms. Smith also testified that she had a conversation with Maria Hernandez after the shooting wherein Ms. Hernandez stated that she did not see who shot her and was unsure who was responsible.  *Id.* at 16-17.

11

Second, Theresa Rose-Demni alleges in her affidavit:

1.  I was present at the time the shooting took place on April 12, 1998, and observed that Mr. Hodgson did not fire a weapon.  In addition, I observed Rob Wyatt a/k/a "Big Rob" fire a weapon.

2.  I did not initially divulge this information to the police because I was afraid of Rob Wyatt a/k/a "Big Rob," who at the time lived two blocks from my house.

3.  I spoke to Mr. Hodgson's lawyer, Kerry Mitchell, about this information and told him I would be willing to testify on Mr. Hodgson's behalf, however, Mr. Mitchell never contacted me about testifying, and I was never called by anyone to testify at Mr. Hodgson's trial.

4.  After Mr. Hodgson conviction, Mr. Hodgson's appellate lawyer sent a private investigator who took a statement from me, which was reduced to writing on or about December 5, 1998 [less than one month after the trial concluded and before Petitioner was sentenced].  The statement was done by me in the name Theresa Rose, my maiden name at the time.

5.  I subsequently moved to North Carolina in October of 1999, and didn't move back to Michigan until November 18, 2001.

6.  I was unaware of any post-conviction proceedings that were taking place on Mr. Hodgson's behalf.  Had I known, I would have testified as to my knowledge of the circumstances of the shooting.

7.  I am willing to testify to the above  facts in open court, under oath, if necessary.

Pet., Exhibit I, att. 2.

Additionally, there are five other witnesses who would have testified favorably for Petitioner at trial.  However, it is not clear whether Mr. Mitchell knew of their existence while preparing for trial.

Edwardo Hinton would have testified that he was present during the shooting; he saw Robert Wyatt with a gun; Mr. Wyatt had possession of the gun during the shooting;

12

Petitioner was unarmed; and he witnessed Mr. Wyatt fire his weapon earlier in the evening. Evid. Hr'g., 1/26/01, 33-39.  Mr. Hinton also indicated that he never went to the police because he caught a case in the interim and was incarcerated.  *Id.* at 52. Therefore, although he was unaware of Petitioner's circumstances at trial, he would have testified if asked as to what he observed on the day in question.  *Id.* at 54-56.

Michael Hinton, Edwardo Hinton's brother, would have testified that Robert Wyatt discharged his gun prior to the incident; Petitioner did not have possession of a gun; Mr. Wyatt had possession of a weapon directly after the shooting; and Mr. Wyatt said that he was going to do a shooting prior to Maria Hernandez and Scott Anderson being shot *Id.*  at 59-61, 63-65, 77.

Joseph Probe would have testified that Mr. Wyatt informed him that he was armed; Mr. Wyatt admitted to him (Probe) that he fired the shots; Mr. Wyatt knew that Petitioner was being  blamed for the shooting; and Mr. Wyatt asked Mr. Probe to dissuade witnesses from coming to court.  *Id.* at 86-89.

Lieutenant Vicki Close would have testified that she was employed with the Department of Corrections' Saginaw Correctional Facility and that it was her job to monitor the inmate mail of gang members.  Evid. Hr'g., 3/9/01, 5-6.   As part of her duties, she read the mail of Petitioner's brother and came into contact with Petitioner's mail.  *Id.* at 7.  These letters were purportedly from Mr. Wyatt, as they were signed "Rob," and Ms. Close believed they were from Robert Wyatt, even though his full name was not signed at the end of the letters.  *Id.* at 9-10.   The letters were apologetic in nature and included statements that Mr. Wyatt committed the shootings.  *Id.*

Finally, Henry Fields would have testified that he saw Mr. Wyatt with a nine-

13

millimeter pistol and saw him commit the shootings.  Evid. Hr'g., 3/30/01, pp. 9-10, 14.

Mr. Fields also indicates that he never came forward because two days after the

shooting, he was taken into federal custody and incarcerated at FCI-Milan.  *Id.*  15-16.

He did indicate, however, that although he was never contacted by trial counsel, he was

interviewed by an investigator for Petitioner's appellate counsel directly after his trial.

*Id.* at 16.  Mr. Fields states that he would have testified at trial if he had been contacted.

*Id.*  at 16-17.

Mr. Mitchell's response to the existence of all of these witnesses is that he only

recalls speaking with Petitioner about general trial strategy and which witnesses they

intended to call.  Evid. Hr'g., 5/4/01, pp. 5-6.  He has no recollection about any other

details, and was not in a position to review the file to refresh his memory as he released

Petitioner's file to another attorney.  *Id.*  Mr. Mitchell  also admits that his theory of the

case

was not that Robert Wyatt was the real shooter, but rather that the physical evidence

showed that someone other than Petitioner committed the shootings. *Id.* at 14 - 16.

First, the record shows that the information regarding Virginia Smith's and

Theresa Rose-Demni's potential testimony was supplied to and/or was available for Mr.

Mitchell prior to trial.  Simply because Mr. Mitchell does not remember whether he knew

about these witnesses does not mean he was unaware of their existence.

Second, the fact that Petitioner's appellate counsel's investigator located

Theresa Rose-Demni and obtained a statement from her less than a month after the

trial concluded and before Petitioner was sentenced speaks to Mr. Mitchell's lacking

investigative effort in locating witnesses. Pet. Ex. I, att. 1.  Henry Fields is another

14

witness who was contacted directly after Petitioner was found guilty at trial by Petitioner's appellate counsel's investigator.  Edwardo and Michael Hinton were present at the shooting, and the record does not indicate that there were any barriers in securing their appearance at trial.  It is unclear whether trial counsel knew or should have  known about Lieutenant Vickie Close or Joseph Probe, but certainly the fact that Lieutenant Close worked for the Department of Corrections would have made it easy to locate her for subpoena purposes.

The testimony of any of these witnesses would have provided invaluable evidence that Petitioner did not shoot Maria Hernandez and Scott Anderson.  By Mr. Mitchell's own admission, the testimony would not have been cumulative since he did not present any evidence to the jury identifying Robert Wyatt as the shooter.  Rather, the testimony would have differed "'in a substantial way - in strength and subject matter - from the evidence actually presented' at trial."  *Broom v. Mitchell,* 441 F.3d 392, 410 (6th Cir. 2006) quoting *Clark v. Mitchell,,* 425 F.3d 270, 286 (6th Cir. 2005).   Despite the non-cumulative nature of the testimony of these witnesses, the evidence would have been consistent with the defense theory that someone other than Petitioner committed the shootings and would have given the defense more substance.

15

Finally, the weakness of Maria Hernandez'[1], Scott Anderson's[2], and Veronica Adamson's[3] eyewitness testimony and the lack of physical evidence linking Petitioner to the crime should have convinced Mr. Mitchell of the need to investigate the witnesses of which he was aware. "Counsel's failure to follow these promising leads leaves no 'room for debate' that [the] truncated investigation was deficient." *Harris v. Bell,* 417 F.3d 631, 639 (6th Cir. 2005). Counsel could not possibly have evaluated or weighed the risks and benefits of calling the witnesses without so much as asking them what they would say if called. *Towns v. Smith,* 395 F. 3d at 260. Absent any contact with the witnesses, counsel was ill-equipped to assess the value of their testimony.

The Court's confidence in the outcome of the trial has been undermined by Mr. Mitchell's failure to investigate and call some, if not all, of the above referenced witnesses. Although Petitioner was "not entitled to an attorney who will not leave the smallest stone unturned," the stones that he did leave, "should at least [have been] nudged." *Coleman v. Brown,* 802 F.2d 1227, 1234 10th Cir. 1986) quoted in *Bigelow v.*

---

[1] Maria Hernandez testified that she saw Petitioner with a gun. However, she did not see Petitioner commit the shootings. She testified that she heard Petitioner say "shoot the bitch" and she heard shots. Ms. Hernandez told Officer Cathy Singleton and Officer William Melendez that Petitioner committed the shootings.

[2] Scott Anderson testified at the preliminary examination that he did not see Petitioner with a gun, but at trial he changed his testimony and stated that he did see Petitioner with a gun. In both instances, he does not testify that he saw Petitioner commit the shootings. Only that he heard Petitioner say "shoot the bitch" and he heard shots.

[3] Veronica Adamson testified that although she gave a statement to the police supporting Ms. Hernandez's version of events, she (Ms. Adamson) lied in order to help her friend. Ms. Adamson in actuality did not hear Petitioner say "shoot the bitch," nor did she see him shoot anyone.

*Williams,* 367 F.3d 562, 573 (6th Cir. 2004).  The state court's conclusion that Mr.

Mitchell was not ineffective was objectively unreasonable.

## B.  Prior Bad Acts

Petitioner claims that it was trial court error for Ubaldo Mendoza's testimony

concerning Petitioner's alleged  delinquency in child support payments, his contact with

the police about the matter, and an outstanding murder warrant, to be admitted into

evidence. The Michigan Court of Appeals rejected Petitioner's claim:

> With respect to Mendoza's testimony referring to Hodgson's contact with
> the police for "child support payments," the transcripts make it clear that
> the prosecutor was attempting to elicit Mendoza's recollection of
> Hodgson's confession to the charged offense, which was a proper line of
> inquiry.  While this nonresponsive answer may have warranted an
> objection from Mitchell, there was no such objection or request for a
> curative instruction.  This was also an "incidental" part of the "complete
> story" of the offense and its aftermath as Hodgson decided to relate it in a
> public place where he risked being overheard.  More importantly, the
> prosecutor did not ask any further questions regarding child support nor
> discuss the issue during closing argument.  Thus, we cannot conclude that
> this remark was at all prejudicial, much less that it affected Hodgson's
> substantial rights.
>
> Further, with respect to Mendoza's testimony referring to Hodgson's
> statement about his police contact related to murder charges, this was not
> a prior, or other, bad act.  Instead, this murder charge was for the criminal
> conduct at issue in this case, which Mendoza related as Hodgson
> described it.  This was specifically admissible against Hodgson at trial as
> an admission.  Therefore, Hodgson has again failed to demonstrate a
> plain error affecting his substantial rights.

*Hodgson,* 2002 WL 226892 at *6.

Alleged trial court errors in the application of state evidentiary law are generally

not cognizable as grounds for federal relief.  See *Estelle v. McGuire,* 502 U.S. 62, 67-68

(1991); *Serra v. Michigan Dept. Of Corrections,* 4 F.3d 1348, 1354 (6th Cir. 1993).  An

evidentiary ruling may violate  due process and warrant habeas relief only when it is "so

17

egregious that it results in a denial of fundamental fairness." See *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003); *Clemmons v. Sowders,* 34 F.3d 352, 356 (6th Cir. 1994). The United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. See *Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh,* 329 F.3d 496, 512 (6th Cir. 2003).   Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. §2254(d)(1).  *Id.* at 513; see also *Adams v. Smith,* 280 F.Supp.2d 704, 716 (E.D. Mich. 2003).  Petitioner, thus has failed to state a claim upon which federal habeas relief may be granted as to this issue.

## C. Newly Discovered Evidence

Petitioner next contends that the state court's refusal to grant his post-conviction motion for a new trial, which was based upon newly discovered evidence, resulted in a denial of his due process rights.  The Michigan Court of Appeals reviewed Petitioner's newly discovered witnesses and was not persuaded to grant Petitioner a new trial. However, the new evidence before *this* Court differs from that presented before the Michigan Court of Appeals.  At the appellate level, Petitioner attempted to persuade the court that the above referenced witnesses and their testimony were newly discovered; and therefore a new trial was warranted.  The Michigan Court of Appeals did not agree and stated as follows:

With respect to Hodgson's argument, apparently concerning all the

18

defense witnesses at the *Ginther* hearing except Mitchell and Close, he has failed to prove that they could not be discovered.  Hodgson contends that concluding he was afforded the effective assistance of counsel because Mitchell could not discover the Hinton brothers, Probe, and Hines also logically  requires us to conclude that their testimony was newly discovered.  However, Hodgson personally knew these men.  Hodgson's failure to reveal their existence to Mitchell excuses Mitchell's failure to call them to testify.  This failure also suggests that if Hodgson had been reasonably diligent in preparing his own defense with Mitchell, Mitchell would have been able to find and produce at trial most, if not all, of these men because they were incarcerated and therefore possible to produce at trial with a writ of habeas corpus.

While we seriously  consider Hodgson's argument that the letters from "Rob" or "Big Rob" were newly discovered, having been sent after trial, and therefore impossible to produce at trial, we question what effect they would have had on the outcome of this case.  Though the letters did not include precisely the same information conveyed through other witnesses at trial, the jury was well-aware that the defense theory was that another person was the shooter.  Hodgson's point that the letters would have given a name to this other person is valid.  However, Maria Hernandez and Scott Anderson both gave vivid and compelling testimony, which a number of other witnesses corroborated.  Thus, we cannot say that it is reasonably probable that this additional piece of information from a witness who could not be examined because he is dead and who also had a criminal history, would have tipped the scales in favor of Hodgson.

*Hodgson,* 2002 WL 226892 at *5 -*6.

Before addressing Petitioner's point of trial court error regarding his motion for a new trial, the Court notes that it finds curious three aspects of the Michigan Court of Appeals' analysis.  First, the record does not indicate that Petitioner failed to tell Mr. Mitchell about the above referenced witnesses.  The record is silent on the issue. However, it appears that the appellate court assumed that since there was no testimony from Petitioner either at the *Ginther* hearing or in an affidavit that he made Mr. Mitchell aware of the above referenced witnesses and testimony, that he must have been dilatory and failed to tell Mr. Mitchell about these witnesses. Therefore, the silence in

19

the record worked against Petitioner in the appellate court.

However, secondly, the record is also silent about what witnesses Mr. Mitchell was aware of at the time of trial, if any, because he testified at the *Ginther* hearing that he had no recollection of those details. In fact, Mr. Mitchell did not state that Petitioner failed to inform him about the identity of potential witnesses. To the contrary, he testified that he and Petitioner discussed strategy and what witnesses were going to be called. However, because the record does not bear out that Mr. Mitchell had specific knowledge of the above referenced witnesses prior to or at the time of trial, the appellate court assumed that he had no knowledge of or reason to know of the witnesses and their testimony, and was not found to have provided ineffective assistance of counsel. Therefore, the silence in the record worked in Mr. Mitchell's favor in the appellate court.

Finally, the appellate court found that Mr. Mitchell was not ineffective because the record did not indicate that he knew about the referenced witnesses, yet the court also states that these witnesses could have been discovered with reasonable diligence. The appellate court goes on to place the entire onus of locating and identifying witnesses upon Petitioner, by stating the following:

> Hodgson's failure to reveal their existence to Mitchell excuses Mitchell's failure to call them to testify. This failure also suggests that if Hodgson had been reasonably diligent in preparing his own defense with Mitchell, Mitchell would have been able to find and produce at trial most, if not all, of these men because they were incarcerated and therefore possible to produce at trial with a writ of habeas corpus.

The Court agrees that a client should assist his or her attorney in preparing for trial. However, for an attorney to be completely absolved of any responsibility if the client is

20

not diligent in providing leads for the attorney appears to be an unfair shift in duties and obligations in the attorney/client relationship. *Strickland* requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington,* 466 U.S. at 691.

In any event, as to Petitioner's habeas claim, he asserts that the newly discovered evidence he wanted to present at a new trial would have proven his actual innocence.  The criteria for a trial court in granting or denying a new trial are matters of state law.  Because a federal habeas court may not correct a state court's misapplication of its own law, a state trial court's denial of a motion for a new trial based upon newly discovered evidence is not a ground for habeas relief.  See *Kirby v. Dutton,* 794 F.2d 245, 246-47 (6th Cir. 1986); *Monroe v. Smith,* 197 F.Supp.2d 753, 763 (E.D. Mich. 2001)(a claim that a habeas petitioner is entitled to relief based upon the failure of state trial  judge to grant him a new trial on the basis of newly discovered evidence is not cognizable in a habeas proceeding).   "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact." *Herrera v. Collins,* 506 U.S. 390, 400 (1993). Thus, Petitioner's claim that he has newly discovered evidence does not state a claim upon which habeas relief can be granted.  See *Johnson v. Hofbauer,* 159 F.Supp.2d 582, 606 (E.D. Mich. 2001).

However,  "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief *absent an independent constitutional violation occurring in the underlying state criminal proceeding.*"  *Herrera,* 506 U.S. at 400  (emphasis added).  Moreover, federal courts which have suggested that habeas relief could conceivably be granted upon newly discovered evidence have

21

set an extraordinary showing of petitioner's innocence before relief could be granted.
*Dell v. Straub,* 194 F.Supp.2d 629, 657 (E.D. Mich. 2002); *Johnson,* 159 F.Supp.2d at
606.  Even on direct appeal, motions for a new trial based upon newly discovered
evidence "are disfavored and should be granted with caution."  *Monroe,* 197 F.Supp.2d
at 763, quoting *United States v. Turns,* 198 F.3d 584, 586 (6th Cir, 2000).   When a
defendant in federal court makes a motion for a new trial based upon newly discovered
evidence, a defendant must show: (1) the evidence was discovered after trial; (2) the
evidence could not have been discovered earlier with due diligence; (3) the evidence is
material and not merely cumulative or impeaching; and (4) the evidence would likely
produce an acquittal if the case was retried. *Turns,* 198 F.3d at 586-87.

First, for the reasons set forth above, Petitioner received ineffective assistance of
counsel at trial relative to his failure to produce potential witnesses and his failure to
conduct a proper investigation.  Therefore, an independent constitutional violation under
the Sixth Amendment occurred in the underlying state criminal proceeding.

Second, Petitioner has met the standard required for a new trial based upon
newly discovered evidence.  As previously stated, the new evidence before this Court
differs from that presented to the Michigan Court of Appeals.  Shawn Deese is related to
Maria Hernandez through, Juan Menendez, his first cousin. Mr. Deese who was
incarcerated at the time he prepared his affidavit, stated in part:

> After Mr. Hodgson's conviction, "Maria" was involved in a group discussion
> in my presence with friends; where upon she indicated that she knows that
> Mr. Hodgson did not shoot her, but that she testified that he did do it
> because somebody had to "pay for it."

Pet. Ex. I, att. 3.

Alma Smith allowed Maria Hernandez to reside with her in her home before and

after the shooting.  She attested to the following in part:

>  6.  At one point, I overheard Ms. Hernandez ("Maria") while she was
>  involved in a group discussion with friends at my house about the
>  shooting.

>  7.  At that point, she indicated that she knows that Mr. Hodgson did not
>  shoot her, but that she told the police that Mr. Hodgson did the shooting
>  because his aunt told her to do so.

Pet. Ex. I, att. 4.


Dawn Marie Williams stated the following in her affidavit:

>  3.  After he [Scott Anderson] was shot, I and other people talked with him
>  about the case in the late Summer 1998; whereupon he indicated that he
>  knew that Richie [Petitioner] did not do the shooting, but that they were
>  going to say Richie was the shooter because they did not like him and
>  they wanted to get him out of the neighborhood.

>  4.  After Richie was convicted in this case, I also spoke with Rob Wyatt
>  t[oo] on two separate times about the case: whereupon he indicated that
>  he (Mr. Wyatt) was the shooter in this case, and that he felt bad about
>  Richie getting convicted for something he did not do.

Pet. Ex. I, att. 5.

Finally, Melissa Romberg was sitting on her front porch, two houses down from

where the shooting took place.  She testified as follows:

>  2.  Before the gunshots were fired, I observed Maria and Richard Hodgson
>  standing in the street talking.

>  3.  After hearing the gunshots, I observed Mr. Hodgson run from the
>  scene.  At that time, I observed both of his hands and could see that he
>  did not have a gun.

>  4.  After Maria, who was one of the shooting victims, was released from
>  the hospital for gunshot wounds, I spoke to her.  At that time, she
>  indicated that she did not know who had shot her, but that she was going

23

to blame Mr. Hodgson because he was there at the time of the shooting.

5.  I did not come forward with this information before or after the shooting because I was told by my boyfriend Kevin Deese, that I should not get involved because of the possible danger to me and my family.

Pet. Ex. I, att. 6.

The Court finds that Petitioner's presentation of the five referenced affidavits from individuals who were either friends, relatives or neighbors of the *victims* are new[4], reliable, and trustworthy evidence that were not presented at trial.  The substance of these affidavits exculpate Petitioner or at a minimum demonstrate that an acquittal is likely if the case were retried.  Therefore, the writ of habeas corpus is granted on this issue.

## IV.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED.**

Unless a date for a new trial is scheduled within ninety (90) days, Petitioner Hodgson must  be unconditionally released.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 16, 2009

I hereby certify that a copy of the foregoing document was served upon the parties

---

[4]The record does not indicate that any of these witnesses were available or reasonably discoverable at the time of trial.

and/or counsel of record on March 16, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager